**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Richard M. MITCHELL,**
**Defendant–Appellee.**

**No. 92–5663.**

United States Court of Appeals,
Fourth Circuit.

Argued Dec. 3, 1992.

Decided Feb. 9, 1993.

Andrew Gerald McBride, Asst. U.S. Atty., Alexandria, VA, argued (Richard Cullen, U.S. Atty., W. Neil Hammerstrom, Jr., and David G. Barger, Asst. U.S. Attys., on brief), for appellant.

Mark Daniel Hopson, Washington, DC, argued (Thomas C. Green, Carter G. Phillips, Tamara L. Cohen, and Ashutosh A. Bhagwat, on brief), Sidley & Austin, for appellee.

Before MURNAGHAN, WILKINS and WILLIAMS, Circuit Judges.

## OPINION

MURNAGHAN, Circuit Judge:

Defendant Robert Mitchell, a zoologist working for the United States Department of the Interior, was charged in a nine count indictment with obstructing and impeding the administration of the internal revenue laws, 26 U.S.C. § 7212(a), violating the federal conflict of interest laws, 18 U.S.C. § 208, aiding and assisting in the preparation of false tax returns by others, 26 U.S.C. § 7206(2), taking and transporting animals in violation of foreign law, 16 U.S.C. § 3372(a)(2), and smuggling in violation of 18 U.S.C. § 545.

On Mitchell's motion to dismiss and the government's motion to determine foreign law, the district court dismissed before trial Counts 1 and 8. Count 1 charged the corrupt obstruction of the administration of revenue laws under 26 U.S.C. § 7212(a). The court dismissed the Count because it determined that the statute did not reach the conduct alleged. Count 8 charged a violation of the Lacey Act, which makes it illegal under United States law to violate the wildlife import-export laws of a foreign nation. The court dismissed Count 8 after a hearing to determine foreign law. That decision was based on the district court's holding that neither of the two Pakistani laws alleged to have been violated were applicable. The government prior to trial has taken an interlocutory appeal contesting the dismissal of both Counts.

### I. Count 1

Since 1979 Mitchell has been employed by the Fish and Wildlife Service of the Department of the Interior. His duties have included implementing federal law involving international wildlife conservation, reviewing applications for wildlife import and export permits, working as a program manager for China and Pakistan at the Smithsonian Institution, organizing field research and collection of specimens, and developing educational and training programs.

In March of 1984, according to Count 1 of the indictment, Mitchell incorporated an organization known as the American Ecological Union, Inc. (AEU) under his home address in Arlington County, Virginia. In May of that year, he filed an Application for Recognition of Exemption with the IRS to have AEU recognized as a tax-exempt organization for purposes of soliciting contributions. Mitchell's application represented that AEU's fund-raising activities would consist of writing proposals to obtain grants, and that the organization would provide benefits and services related

to its exempt function of promoting and facilitating scientific research in the area of ecology.

The government charged that beginning in February 1985, Mitchell used AEU and its tax-exempt status as a vehicle to solicit "contributions" from big-game hunters. He induced payments to AEU from hunters, with offers to arrange hunting privileges in Pakistan and China. He obtained permits, made arrangements for hunting trips in Pakistan and China, lobbied on behalf of the contributors to have endangered animals de-listed, and accompanied several contributors on big game hunts. Mitchell then caused the big-game hunters to file fraudulent income tax returns that claimed the donations to AEU as tax-deductible contributions.

Mitchell's activities, as charged in Count 1 of the indictment, comprised an "artifice and scheme to defraud the United States." The artifice and scheme, the government contended, was a corrupt endeavor to impede and obstruct the due administration of the tax laws, and thus constituted a violation of 26 U.S.C. § 7212(a). Mitchell claimed that although the activity charged might be criminal, it did not state a violation of § 7212(a). The district court in agreeing read the statute narrowly and found that 26 U.S.C. § 7212(a) required "that kind of corruption that goes to a particular officer or employee."

■ The government's appeal of the district court's dismissal of the Count presents us with the task of discerning the reach of the statute. 26 U.S.C. § 7212(a) provides that

—Whoever corruptly or by force or threats of force ... endeavors to intimidate or impede any officer or employee of the United States acting in an official capacity under this title, or in any other way corruptly or by force or threats of force ... obstructs or impedes, or endeavors to obstruct or impede the due administration of this title ...

shall be subject to fines or imprisonment. There is no contention that Mitchell interfered with Internal Revenue Agents or other government officials, or used force or threats of force to interfere with the due administration of the Code. The question is whether the second omnibus clause prohibiting action that "in any other way corruptly ... obstruct[s] or impede[s] ... the due administration" of Title 26 reaches fraud and misrepresentation, or whether the clause prohibits only more narrowly defined means of obstructing the tax laws.

On appeal Mitchell has argued that the trial court correctly dismissed Count 1 because a violation of 26 U.S.C. § 7212(a) requires some action taken against another person as the object of the action. The sort of action contemplated under the statute, he submits, is bribery, solicitation or subornation. Mitchell in focusing on the word "corruptly" has argued that the term refers to the *means* by which a defendant obstructs or impedes due administration of the tax laws, rather than simply defining a state of mind.

Mitchell offered two cases to advance his argument that a corrupt endeavor as used in § 7212(a) refers to only specific means of obstructing the tax laws such as solicitation or subornation. In *United States v. Reeves*, 752 F.2d 995 (5th Cir.), *cert. denied*, 474 U.S. 834, 106 S.Ct. 107, 88 L.Ed.2d 87 (1985), the Fifth Circuit rejected the definition of "corruptly" used at trial below—"with improper motive or bad or evil purpose"—as redundant and potentially overbroad or vague. In *United States v. Poindexter*, 951 F.2d 369 (D.C.Cir.1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 656, 121 L.Ed.2d 583 (1992), the Circuit Court of the District of Columbia found the term "corruptly" to be vague in the context of the obstruction of justice statutes. The court stated, "[i]n the absence of some narrowing gloss, people must guess at [ ][the] meaning [of the word corruptly] and differ as to its application." *Id.* at 378. *Poindexter* applied the principle of *ejusdem generis* to the obstruction of justice statute and reasoned that corruptly must mean some form of subornation since the other terms used in the statute—"force" and "threats"—referred to actions directed at another person. *Id.* at 379.

Neither of those cases persuades us that only subornation constitutes a corrupt endeavor under § 7212(a). *Reeves,* though rejecting the contention that corruptly refers only to improper motive or intent, did not go so far as to adopt *Mitchell's* interpretation of the word or reach of the statute. "Corruptly," *Reeves* noted, "describes an act done with an intent to give some advantage inconsistent with the official duty and rights of others.... It includes bribery but is more comprehensive, because an act may be corruptly done though the advantage to be derived from it be not offered by another." *Reeves,* 752 F.2d at 998 (citations and quotations omitted). That definition neatly describes Mitchell's conduct of fraudulently representing to the IRS that his organization was involved in tax exempt activities, of using his tax exempt status to solicit contributions that were not used for tax-exempt purposes, and of inducing hunters to file false returns. Each resulted in benefits to Mitchell and to the hunters that were inconsistent with the legal rights and duties of themselves and others. *Reeves,* in rejecting the definition of improper or evil intent to define the contours of § 7212(a), did not exclude fraud and misrepresentation from its purview. Rather, *Reeves* was concerned with excluding from its purview the type of impediments to tax administration engaged in with no intent to gain any improper advantage or benefit. *See Reeves,* 752 F.2d at 999 ("A disgruntled taxpayer may annoy a revenue agent with no intent to gain any advantage or benefit other than the satisfaction of annoying the agent. Such actions by taxpayers are not to be condoned, but neither are they 'corrupt' under section 7212(a)"). Misrepresentation and fraud, in fact, are paradigm examples of activities done with an intent to gain an improper benefit or advantage.

In addition, this court has rejected the position that a "corrupt endeavor" as used in obstruction of justice statutes must involve means that are illegal in themselves, such as bribery or intimidation. *United States v. Mitchell,* 877 F.2d 294, 299 (4th Cir.1989). In *Mitchell,* where a congressman's relatives were charged under 18 U.S.C. § 1505 for taking money to influence the congressman's investigation, we upheld the convictions, rejecting the defendants' contentions on appeal that they had not acted corruptly because bribery or extortion were not used or contemplated. "Such a narrow interpretation of § 1505 runs contrary to the well-established rule that the omnibus clause of the federal obstruction statutes should be broadly construed." *Id.* at 298 (citations omitted). The court explained the rationale for the broad construction: "The obstruction statute was drafted with an eye to 'the variety of corrupt methods by which the proper administration of justice may be impeded or thwarted, a variety limited only by the imagination of the criminally inclined.'" *Mitchell,* 877 F.2d at 299 (quoting *United States v. Griffin,* 589 F.2d 200, 206–07 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 48, 62 L.Ed.2d 32 (1979)). The *Mitchell* court signaled that § 7212(a) should be interpreted in the same broad fashion by citing with approval *Reeves'* broad reading of the term corruptly for the proposition that "means, other than 'illegal means,' when employed to obstruct justice, fall within the ambit of the 'corrupt endeavor' language of federal obstruction statutes." *Mitchell,* 877 F.2d at 299.

Therefore we decline to adopt the narrow interpretation of the omnibus word "corruptly" as only describing an element of *actus reus* of the crime charged under § 7212(a). We follow instead the lead of the Eleventh and the Eighth Circuits, which have held that § 7212(a) encompasses fraud of the type alleged in the instant case. *See United States v. Popkin,* 943 F.2d 1535 (11th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1760, 118 L.Ed.2d 423 (1992) (attorney who created a corporation to enable his client to disguise the character of his income earned on drug deals, repatriate the tainted money, and avoid reporting income in the taxable year it was earned violated § 7212(a)); *United States v. Williams,* 644 F.2d 696 (8th Cir.), *cert. denied,* 454 U.S. 841, 102 S.Ct. 150, 70 L.Ed.2d 124 (1981) (defendant who aided and abetted the filing of false W–4 forms

violated § 7212(a)). Both cases favored a broad construction of the omnibus clause. *See Popkin,* 943 F.2d at 1540 (word corruptly was used to "prohibit all activities that seek to thwart the efforts of government officers and employees in executing the laws enacted by Congress"); *Williams,* 644 F.2d at 700 (the broad language of section 7212(a)'s clause demands a correspondingly broad construction).

A number of other courts have presumed a broad reading of the provision. They have upheld or overturned convictions under § 7212(a) for a broad range of activity akin to the fraudulent activity alleged in the instant case, without deciding any issues regarding the proper interpretation of the provision. *See, e.g., United States v. Shriver,* 967 F.2d 572 (11th Cir.1992) (transfer of real estate to avoid execution of IRS lien); *United States v. Yagow,* 953 F.2d 423 (8th Cir.1992) (sending false 1099 forms to institutions involved in liquidation of defendant's farm and filing the forms with the IRS); *United States v. Hatchett,* 918 F.2d 631, 634 (6th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 2839, 115 L.Ed.2d 1008 (1991) (conversion of client checks to cash and purchase of goods in third parties' names to evade collection of back taxes); *United States v. I.H. Hammerman,* 528 F.2d 326, 328 (4th Cir.1975) (acting as bagman for collecting monies in tax evasion scheme); *United States v. Krause,* 786 F.Supp. 1151 (E.D.N.Y.1992) (defrauding the IRS by filing false returns stating payments of huge fictitious salaries to named individuals).

Mitchell's contention that the legislative history of § 7212 clearly limits the scope of the statute to corrupt solicitation or subornation is unpersuasive. We do not find the history particularly enlightening or dispositive as to Congress's understanding of the precise scope of the omnibus provision. *See Williams,* 644 F.2d at 699 n. 13 (the scant legislative history is unhelpful because it does not speak to the omnibus clause). However, the expressed intent of the Congress to expand the reach of the statute beyond protection for IRS agents against force to cover threats and intimidation as well, and the inclusion of the omnibus "in any other way" and "the due administration of this title" language encourage a broad rather than narrow construction. *See United States v. Martin,* 747 F.2d 1404, 1409 (11th Cir.1984) ("the legislative history does not purport to limit the broad language [of the statute]"). *See also* H.R.Rep. No. 1337, 83rd Cong., 2d Sess. (1954); S.Rep. No. 1622, 83rd Cong., 2d Sess. (1954).

In sum, we reverse the district court's dismissal of Count 1. The conduct alleged in Count 1 is admittedly broad. The government has charged Mitchell with improperly filing an application for tax-exempt status, misrepresenting the purpose of his organization to get tax exempt status, using the corporation as a vehicle to solicit "contributions," using those funds to secure hunting permits and arrange hunting trips, and causing or inducing the big game hunters to file false and fraudulent tax returns. It is just such a creative and multi-faceted scheme to evade taxes that the omnibus clause of § 7212 targets. As the Eleventh Circuit noted in *Martin,* "[c]ongress was not required to list in the legislative history every conceivable corrupt endeavor to avoid waiving the statute's application to one kind of corrupt endeavor." *Martin,* 747 F.2d at 1409. Section 7212(a) should be given the full scope its broad language commands. Accordingly, we order reinstatement of Count 1.

## II. *Count 8*

We now turn to the dismissal of Count 8, which charged a violation of the Lacey Act. The Lacey Act makes it unlawful to "import, export, transport, sell, receive, acquire or purchase in interstate or foreign commerce ... any fish or wildlife taken, possessed, transported or sold ... in violation of any foreign law." 16 U.S.C. 3372(a)(2)(A). The government alleged in Count 8 that in September of 1987, Mitchell transported the hides and horns of a Punjab urial (wild sheep) and a Chinkara gazelle out of Pakistan and into the United States knowing that the animals had been taken, possessed or transported in violation

of Pakistani law. The superseding indictment identified two laws of Pakistan prohibiting the unlicensed hunting, possession or export of such animal trophies: the Pakistani Imports and Exports (Control) Act of 1950 and the Punjab Wildlife Act of 1974.

The government moved the district court to make a determination of foreign law under Federal Rule of Criminal Procedure 26.1, and both parties offered memoranda and affidavits to support their readings of the Pakistani laws. After a hearing on the matter, the district court held that a personal baggage exception in the Imports and Exports Act's Control Order of 1987 permitted Mitchell's unlicensed export of the animal hides from Pakistan. It held the Punjab Wildlife Act invalid to the extent that it regulated exports across provincial borders, because the Pakistani Constitution reserved such powers to the federal government. Accordingly, the district court dismissed Count 8, and subsequently denied the government's motion for reconsideration of the ruling, which was accompanied by new affidavits concerning the interpretation of the Act.

■ The determination of foreign law is a question of law to be established by any relevant source, whether or not submitted by a party or admissible under the Federal Rules of Evidence. *See* Fed.R.Crim.P. 26.1; *United States v. Peterson*, 812 F.2d 486, 490–91 (9th Cir.1987). The broad discretion afforded a court in considering evidence to determine foreign law derives from the general unavailability of foreign legal materials, and the frequent need for expert assistance in understanding and applying the materials. In determining questions of foreign law, courts have turned to a wide variety of sources including affidavits and expert testimony from an Australian Federal Judge, *United States v. Molt*, 599 F.2d 1217, 1220 (3rd Cir.1979), a Peruvian Minister of Agriculture, *United States v. 2,507 Live Canary Winged Parakeets*, 689 F.Supp. 1106, 1009 (S.D.Fla.1988), and a South African attorney, *United States v. Taitz*, 130 F.R.D. 442, 446 n. 2 (S.D.Cal. 1990); certified translations of Bolivian Supreme Decrees, *United States v. 3,210*

*Crusted Sides of Caiman Crocodilus Yacare*, 636 F.Supp. 1281, 1285 (S.D.Fla.1986); foreign case law, *United States v. Peterson*, 812 F.2d 486, 491 (9th Cir.1987); a student note in a Philippine Law Review, *id.;* information obtained by a law clerk in a telephone conversation with the Hong Kong Trade Office and presented ex parte to the court, *United States v. Hing Shair Chan*, 680 F.Supp. 521, 524 (E.D.N.Y.1988); and the court's "own independent research and analysis" of a Yugoslavian law. *Kalmich v. Bruno*, 553 F.2d 549, 552 (7th Cir.), *cert. denied*, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).

■ Interpretation of the Pakistani laws in question presents some difficulty, because, although the legal system of Pakistan is based on common-law, similar in many respects to American law, neither party produced any cases bearing on the laws. Instead, the parties produced affidavits, letters, telexes, and documents obtained from Pakistani government officials and lawyers, and a legal expert on Pakistani law from the Library of Congress, in an attempt to establish the official position of the Pakistani government on the interpretation of the laws in question. We review the evidence presented *de novo*. *United States v. One Afghan Urial Ovis Orientalis Blanfordi*, 964 F.2d 474, 476 (5th Cir. 1992) (determination of foreign law is subject to *de novo* review).

The government submitted the sworn affidavit of the Inspector General for Forests in the Ministry of Agriculture for the Government of Pakistan (who is also the Secretary of the National Council for Conservation of Wildlife in Pakistan), an expert on Pakistan law from the Library of Congress, official communiques from the American Embassy in Islamabad, Pakistan and the Pakistani Embassy in Washington D.C., and a Fifth Circuit court opinion that had previously addressed the Import and Export law, *United States v. One Afghan Urial Ovis Orientalis Blanfordi*, 964 F.2d 474 (5th Cir.1992). Mitchell, for his part, submitted a letter from a Pakistani Senator, a statement from a Joint Secretary of the Ministry of Commerce, the sworn affi-

davit of an attorney in active practice in Pakistan, and a letter from the Minister of Wildlife for the Sindh Province.

Not surprisingly, those affidavits and letters present conflicting views of the interpretation of the Import and Export Act, as well as of the constitutionality of the Punjabi Wildlife Act, and fail to establish, to this court's satisfaction, a definitive answer as to the official Pakistani interpretation of the laws. Perhaps, as is the case with many of our own laws, a consensus has not yet been reached in Pakistan. Yet we are charged with determining the best reading of the laws. In doing so we have considered all of the evidence brought by the parties, have drawn upon the canons of statutory construction with which we interpret our own laws, and have examined the policies that appear to underlie the Pakistani laws in question. We reject the government's argument that some of Mitchell's affidavits should not have been considered because they were unsworn as well as Mitchell's contention that the additional evidence produced by the government with its motion for reconsideration should not be considered because it was produced after the court below had made its determination.

■ We treat first the Imports and Exports Act. That law authorizes the Federal Government of Pakistan to "prohibit, restrict or otherwise control the import or export of goods of any specified description." Pursuant to the Imports and Exports Act, the government of Pakistan issued an Order in 1987 prohibiting the export of

(A) of any goods of the description specified in Schedule I; and

(B) of any goods of the description specified in Schedules II to VI otherwise than in accordance with the conditions or restrictions specified in those Schedules, except—

.    .    .    .    .

(b) any goods constituting the stores or equipment of any outgoing vessel or conveyance of the *bona fide* baggage of the crew or the passengers in such vessel or conveyance.

Among the items contained in Schedule I are "hides and skins, all sorts," and "wild animal skins . . .; products or derivatives of such skins. . . ." It is uncontested that the skins exported by Mitchell are Schedule I items.

Mitchell argued and the district court ruled that the "baggage exception" contained in clause (b) of the 1987 Order applied to Section A (and therefore to Schedule I goods) as well as to Section B (Schedule II–VI goods). Apparently assuming no question of fact existed as to whether Mitchell had indeed transported the animal trophies out of Pakistan in personal baggage—or as to whether the conveyance was *bona fide* and personal for purposes of the statute—the district court determined that Mitchell had not violated the 1987 Order of the Import and Export Act.

The government has argued on appeal that the district court's interpretation cannot be squared with the plain language and structure of the 1987 Order, and that only a license obtained pursuant to the Imports and Exports Act can render the exportation of animal trophies out of Pakistan legal. The purpose of the trophy ban, the government has said, is wildlife conservation; an exception that would permit the exportation of trophies in "personal baggage" would defeat the purpose of the ban. We agree with the government's reading of the law.

Subsection (b), which contains the exception, is one of 10 subsections—(a)–(j)—that follow Section B. Section B explicitly prohibits the export of goods in Schedules II to IV, while the preceding section A prohibits the export of items in Schedule I. Mitchell has contended that, if subsection (b) is to be read to refer only to Section B, then all of the subsections—(a)–(j)—which are structured as parallel subsections, must also refer only to Section B. While a cursory look at the statute might suggest that the exceptions apply only to the items listed in Section B, he has argued, a reading of the exceptions themselves shows that the exceptions apply to all items listed in both A and B, Schedules I to VI.

For example, although the items here in issue are not mentioned, several exceptions in (a) through (j) specifically mention other Schedule I goods. Exemption (a) states that goods may be exported with a Ministry of Commerce license, provided that, for goods under item one of Schedule I (live animals), a health certificate is also required. Mitchell nevertheless has contended that the last caveat would make no sense if the exception did not apply to Schedule I goods. Similarly, exception (e) discusses artemisia seeds and fissionable materials, both of which are Schedule I goods.

However, the argument renders the separation of Schedule I and II-VI goods in the Order meaningless. There must be some reason why the order did not simply list the exceptions under one Section prohibiting export of items in Schedules I through VI, and it is logical to assume it is because the list of exceptions following Section B does not apply to Section A—Schedule I. Moreover, the mention of Schedule I goods in some of the subsection exceptions does not necessarily mean that all of the exceptions consequently apply to Schedule I items. More reasonably such mention means that only those exceptions that expressly mention Schedule I goods apply to Schedule I, and apply only to the extent they make reference to goods on that Schedule. Furthermore, Schedule I includes items such as fissionable material, arms and explosives, and human skeletons. A reading that permitted these goods, along with animal skins and hides, to be subject to a blanket exception for personal luggage is absurd.

The government's affidavits establish that the 1987 Export Order implemented a federal policy of restricting the export of big-game trophies out of Pakistan. Under the Order, hunters may export certain animal trophies after obtaining export permits. Requiring big game hunters to apply for export permits not only regulates the number and kinds of animal trophies exported, but keeps the government informed of the volume and type of trophies hunters seek to export so that they can more effectively check the hunting of those animals the government wants to conserve. An exception for animal trophies carried out in personal luggage would negate the conservation impact of the policy.

The district court's finding that the personal baggage exception applied to Schedule I goods is contrary to a plain reading of the Order. Perhaps that is why the Fifth Circuit, which had an opportunity recently to look at the Pakistani law and confronted the same personal baggage exception argument, was able to dispense with the matter in just two sentences. The court noted, "[c]laimant also argues that there is a personal baggage exemption for Export trade Order, 1987. That order provides, however, that the exemption applies only to goods listed in Schedules II–VI, not goods, such as the respondent sheep, listed in Schedule I." *One Afghan Urial Ovis Orientalis Blanfordi*, 964 F.2d at 478 n. 4.

We note further, in passing, that both the district court and Mitchell have overestimated the impact of the erroneous ruling that the personal baggage exception applied to Schedule I goods. The ruling did not establish what constitutes "passenger baggage" for purposes of the statute, nor did it establish that Mitchell in fact carried the hides and skins out of Pakistan in personal baggage within the meaning of the exception. Whether the hides and skins would constitute *bona fide* personal baggage should normally not be determined on the basis of the evidence before the district court, but depend upon findings of fact which would better be left to a jury. If the evidence were to show that Mitchell's export of the hides was not for his personal benefit, but was part of a money-making scheme endeavor, the export might not fall under the exception at all. Dismissal of Count 8 was therefore probably unwarranted even under the district court's erroneous ruling that the personal baggage exception applied to Schedule I items.

█ We turn now to the Punjab Wildlife Act. The Act is a provincial law that prohibits hunting in the Punjab (a province of Pakistan) of "wild animals" except in accordance with the provisions of the Act. Section 14(2) of the Act prohibits the export of

any animal trophy of a protected animal out of Punjab without a permit. Section 12(1) makes it illegal to "be in possession of any wild animal" without a certificate of lawful possession. Finally, section 13 of the Act makes it illegal to receive any animal trophy unless a certificate of lawful possession accompanies the transfer. It is uncontested that the Chinkara gazelle and the urial—the skins of which Mitchell allegedly exported from Pakistan—are wild animals for the purposes of the Act.

Mitchell has claimed that Section 14(2) of the Punjab Wildlife Act is invalid under the Pakistani Constitution. Article 151 of the Pakistani Constitution states that

151—(1) Subject to clause (2), trade, commerce and intercourse throughout Pakistan shall be free.

(2) Parliament may by law impose such restrictions on the freedom of trade, commerce or intercourse between one Province and another or within any part of Pakistan as may be required in the public interest.

(3) A Provincial Assembly or a Provincial Government shall not have power to—

(a) make any law, or take any executive action, prohibiting or restricting the entry into, or the export from, the Province of goods of any class or description ...

The "federal legislative list" of the Pakistani Constitution, which lists subject areas within the exclusive legislative jurisdiction of the federal government, lists as item 27 "Import and export across customs frontiers as defined by the Federal Government, interprovincial trade and commerce, trade and commerce with foreign countries...."

The district court held that Section 14(2) of the Punjab Wildlife Act was invalid in light of the provisions of the Constitution quoted above. Based upon that finding, the district court determined that Mitchell violated no law by exporting the animal trophies from the Punjab province. Since a Lacey Act violation depends upon a violation of foreign law, and the export from Pakistan had already been found to be valid because of the personal baggage excep-

tion to the federal export laws, the court dismissed Count 8.

Neither Mitchell nor the government presented any specific authority interpreting or applying the Punjab Wildlife Act, although the law has been in force since 1974. Both parties have claimed that the lack of evidence of constitutional challenge to the law supports their position. Mitchell has argued that, with no evidence to the contrary, the plain reading of the statute in conjunction with the constitution permits a reasonable person to assume that export of animals is a matter of federal, not provincial concern, and thus that the Punjab Wildlife Act is unconstitutional. The government in contesting that interpretation has argued that a United States Court cannot find a foreign law unconstitutional within its own borders if there is no foreign authority for that proposition.

The government also has argued that Article 151 of the Pakistani Constitution, which bears the caption "Inter–Provincial Trade," deals only with commercial trade and commerce between the provinces of Pakistan. The fact that general commercial trade laws are within the exclusive jurisdiction of the federal government, it argues, should not keep provinces from prohibiting the taking of wildlife illegally hunted or acquired within the border of the province outside the province.

That position was buttressed by the evidence submitted by the government after the hearing in its motion for reconsideration. A telex from the United States Embassy in Islamabad, Pakistan said that the Additional Secretary of the Ministry of Law, Justice and Parliamentary Affairs had stated that section 151 of the constitution applied "only to commercial trade between the provinces and in no way restrict[ed] provinces from enacting and enforcing wildlife protection laws, including the prohibition against export of animal trophies out of the province." A second affidavit from the Senior Legal Specialist for the Library of Congress also stated that Article 151 of the Pakistani Constitution applied only to commercial trade.

Only the portion of the Punjab Wildlife Act that restricts the export of animal trophies across Punjab borders is arguably unconstitutional as an invalid encroachment upon federal powers by a province. The Act itself is a wildlife preservation act, and provinces are well within their powers to pass wildlife management laws within their own jurisdiction. Mitchell's own affiant stated that the regulation of wildlife has always been a provincial subject. Thus Punjab may, as it has, pass a law prohibiting the hunting, possession or transport of wild animals without a permit within its own borders. The question is whether a provision in that law restricting the export of illegally hunted animals is also valid. Clearly the inability to prohibit the export from its borders of animals illegally hunted or possessed would limit significantly the province's ability to enforce its wildlife protection laws. On the other hand, whether the Pakistani federal government would consider such a regulation an encroachment upon its federal powers is a matter almost impossible to determine on the basis of the record before us. On balance, however, the declarations submitted by the government indicate to us that the ruling that the provincial wildlife law is unconstitutional under the Pakistani Constitution was error. In any event, however, such a determination is unnecessary to resolve the question of the propriety of dismissal of Count 8.

Under the Lacey Act, the government need not prove that Mitchell actually hunted or exported the animal trophies in violation of a foreign law himself, but only that he received and acquired them in interstate and foreign commerce knowing that they had been hunted, possessed or transported in violation of foreign law. Whether the portion of the Punjab Wildlife Act purporting to restrict the export of protected animal trophies from the Punjab to another province is constitutional or not, there still remains the factual question of whether or not he violated the portions of the law prohibiting possession of the animals without a permit. The government has submitted evidence that Mitchell knew it was illegal to hunt Punjab urial in the Province of Punjab. The government has asserted that it can prove that the animals were illegally hunted, that Mitchell knew that, and that he nevertheless acquired and transported them. Whether he exported them from Punjab itself is inconsequential—and thus whether that portion of the law prohibiting export from Punjab is constitutional is not dispositive.

In sum, we find the district court's ruling that the personal baggage exception permitted Mitchell's unlicensed export from Pakistan of the animal trophies was error, and its interpretation that a portion of the Punjab Wildlife Act was unconstitutional unnecessary and beside the point. We remand with instructions to reinstate Count 8 of the indictment as well as Count 1.

REVERSED AND REMANDED WITH INSTRUCTIONS.